# <u>ORAL ARGUMENT NOT YET SCHEDULED</u>

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 11-1108 (and consolidated cases)

UNITED STATES SUGAR CORPORATION,
Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
Respondent.

Petition for Review of Final Administrative Actions of the
United States Environmental Protection Agency

## PROOF OPENING BRIEF FOR ENVIRONMENTAL PETITIONERS

James S. Pew
Earthjustice
1625 Massachusetts Ave., N.W.
Suite 702
Washington, D.C. 20036-2212
(202) 667-4500
jpew@earthjustice.org

*Counsel for Louisiana Environmental
Action Network, Sierra Club, Clean Air
Council, Partnership for Policy
Integrity, and Environmental Integrity
Project*

**DATED:     August 12, 2014**

**ORAL ARGUMENT NOT YET SCHEDULED**

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| UNITED STATES SUGAR CORPORATION,<br><br>                Petitioner,<br><br>     v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>                Respondent. | ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 11-1108<br>(and consolidated cases) |

## ENVIRONMENTAL PETITIONERS' CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Louisiana Environmental Action Network, Sierra Club, Clean Air Council, Partnership for Policy Integrity, and Environmental Integrity Project (collectively, "Environmental Petitioners") hereby certify as follows:

**(A) Parties and Amici**

**(i) Parties, Intervenors, and Amici Who Appeared in the District Court**

This case is a petition for review of final agency action, not an appeal from the ruling of a district court.

**(ii) Parties to This Case**

<u>Petitioners:</u>

11-1108 United States Sugar Corporation

11-1124   American Forest & Paper Association, National Association of Manufacturers, American Coke and Coal Chemicals Institute, American Iron and Steel Institute, American Municipal Power, Inc., American Wood Council, Biomass Power Association, Chamber of Commerce of the United States of America, Corn Refiners Association, National Oilseed Processors Association, Rubber Manufacturers Association, Treated Wood Council

11-1134   American Petroleum Institute

11-1142   American Chemistry Council

11-1145   Coalition for Responsible Waste Incineration

11-1159   Council of Industrial Boiler Owners

11-1165   Utility Air Regulatory Group

11-1172   Southeastern Lumber Manufacturers Association, Inc.

11-1174   JELD-WEN, Inc.

11-1181   Sierra Club

13-1086   JELD-WEN, Inc.

13-1087   Eastman Chemical Company

13-1091   American Chemistry Council

13-1092   United States Sugar Corporation

13-1096   American Petroleum Institute

13-1097   Utility Air Regulatory Group

13-1098   Louisiana Environmental Action Network , Sierra Club, Clean Air Council, Partnership for Policy Integrity, Environmental Integrity Project

13-1099   Council of Industrial Boiler Owners, American Municipal Power, Inc.

2

13-1100   American Forest & Paper Association, American Wood Council,
Biomass Power Association, Chamber of Commerce of the United
States of America, Corn Refiners Association, National Oilseed
Processors Association, Rubber Manufacturers Association,
Southeastern Lumber Manufacturers Association, National
Association of Manufacturers

13-1103   Coalition for Responsible Waste Incineration

Respondents:

The respondent in all cases is the United States Environmental Protection

Agency. Also named as a respondent in case nos. 11-1134, 11-1181, and 13-1098

is Gina McCarthy,[1] in her official capacity as Administrator of the U.S.

Environmental Protection Agency.

Intervenors:

American Chemistry Council, JELD-WEN, Inc., American Forest & Paper

Association, American Home Furnishings Alliance, Inc., American Iron and Steel

Institute, American Municipal Power, Inc., American Petroleum Institute, Auto

Industry Forum, Biomass Power Association, Chamber of Commerce of the United

States of America, Coalition for Responsible Waste Incineration, Corn Refiners

Association, Council of Industrial Boiler Owners, Energy Recovery Council,

_____

[1] Gina McCarthy is automatically substituted for Lisa Perez Jackson, who resigned,
and Robert Perciasepe. Fed. R. App. P. 43(c)(2).

Florida Sugar Industry, HOVENSA, L.L.C., National Oilseed Processors Association, Rubber Manufacturers Association, Sierra Club, Southeastern Lumber Manufacturers Association, Inc., Tesoro Hawaii Corporation, American Coke and Coal Chemicals Institute, Utility Air Regulatory Group, Waste Management, Inc., American Wood Council, Clean Air Council, Eastman Chemical Company, National Association of Manufacturers, Partnership for Policy Integrity, and WM Renewable Energy, LLC have intervened on behalf of the respondent in these consolidated cases.

### (iii) *Amici* in This Case

There are currently no *amici*.

### (iv) Circuit Rule 26.1 Disclosures for Environmental Petitioners

See disclosure form filed below.

## (B) Rulings Under Review

Environmental Petitioners seek review of final actions taken by EPA at 76 Fed. Reg. 15,608 (Mar. 21, 2011) and titled "National Emission Standards for Hazardous Air Pollutants for Major Sources: Industrial, Commercial, and Institutional Boilers and Process Heaters," and at 78 Fed. Reg. 7138 (Jan. 31, 2013), and titled "National Emission Standards for Hazardous Air Pollutants for Major Sources: Industrial, Commercial, and Institutional Boilers and Process Heaters."

4

**(C) Related Cases**

Apart from the consolidated cases, Environmental Petitioners are unaware of currently pending related cases. The Court has ordered these cases be heard by the same panel as will hear the following currently pending challenges in this Court to rules related to the rules challenged herein:

*American Forest & Paper Association v. EPA*, No. 11-1125 (and consolidated cases)

*American Chemistry Council v. EPA*, No. 11-1141 (and consolidated cases)

*Solvay USA Inc. v. EPA*, No. 11-1189 (and consolidated cases)

DATED:      August 12, 2014                    Respectfully submitted,

/s/James S. Pew
James S. Pew
Earthjustice
1625 Massachusetts Ave., N.W.
Suite 702
Washington, D.C. 20036-2212
(202) 667-4500
jpew@earthjustice.org

*Counsel for Environmental Petitioners*

5

**ORAL ARGUMENT NOT YET SCHEDULED**

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| UNITED STATES SUGAR CORP, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | Case No. 11-1108 |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | ) ) ) ) | (and consolidated cases) |
| Respondent. | ) ) | |

## ENVIRONMENTAL PETITIONERS' RULE 26.1 DISCLOSURE STATEMENT

### Louisiana Environmental Action Network

<u>Non-Governmental Corporate Party to this Action</u>: Louisiana Environmental Action Network ("LEAN").

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: LEAN is a corporation organized and existing under the laws of the State of Louisiana. LEAN is a nonprofit organization which works with citizens' groups throughout the state of Louisiana to develop, implement, protect, and enforce legislative and regulatory environmental safeguards.

**Sierra Club**

<u>Non-Governmental Corporate Party to this Action</u>: Sierra Club.

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: Sierra Club, a corporation organized and existing under the laws of the State of California, is a national nonprofit organization dedicated to the protection and enjoyment of the environment.

**Clean Air Council**

<u>Non-Governmental Corporate Party to this Action</u>: Clean Air Council ("CAC").

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: CAC is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania. CAC is a not-for-profit organization focused on protection of public health and the environment.

**Partnership for Policy Integrity**

<u>Non-Governmental Corporate Party to this Action</u>: Partnership for Policy Integrity ("PFPI").

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: PFPI, a corporation organized and existing under the laws of the Commonwealth of Massachusetts, is a nonprofit organization that uses science, policy analysis, and strategic communications to promote sound energy policy.

## Environmental Integrity Project

<u>Non-Governmental Corporate Party to this Action</u>: Environmental Integrity Project ("EIP").

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: EIP, a corporation organized and existing under the laws of the District of Columbia, is a national nonprofit organization that advocates for more effective enforcement of environmental laws.


DATED:     August 12, 2014              Respectfully submitted,

<u>/s/James S. Pew</u>
James S. Pew
Earthjustice
1625 Massachusetts Ave., N.W.
Suite 702
Washington, D.C. 20036-2212
(202) 667-4500
jpew@earthjustice.org

*Counsel for Environmental Petitioners*

3

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iii

GLOSSARY OF ACRONYMS AND ABBREVIATIONS ................................ vii

JURISDICTIONAL STATEMENT ................................................................... 1

STATUTES AND REGULATIONS .................................................................. 1

STATEMENT OF ISSUES ............................................................................... 1

STATEMENT OF THE CASE .......................................................................... 2

    I.   FACTUAL BACKGROUND. ................................................................... 2

    II.  STATUTORY BACKGROUND. ............................................................. 3

    III. REGULATORY BACKGROUND. ......................................................... 4

        A.  Regulatory History. ........................................................................ 4

        B.  EPA's Refusal To Set Emission Standards For Organic Hazardous
        Air Pollutants. ................................................................................ 5

        C.  EPA's Standard-Setting Approach. ............................................... 6

            1.  EPA's Use Of Subcategories. .................................................. 8

            2.  EPA's Selection Of The Top Boilers. . ................................... 10

            3.  EPA's 99 Percent Upper Prediction. . .................................... 12

            4.  *NACWA* And EPA's *Post Hoc* Rationale For The 99 Percent
            Upper Prediction. ................................................................... 15

SUMMARY OF ARGUMENT ....................................................................... 19

STANDARD OF REVIEW ............................................................................ 21

STANDING .................................................................................................... 20

ARGUMENT .................................................................................................. 22

    I. CARBON MONOXIDE IS NOT A REASONABLE SURROGATE
    FOR ORGANIC HAZARDOUS AIR POLLUTANTS. ............................ 22

    II. EPA'S FLOOR APPROACH IS UNLAWFUL AND ARBITRARY. ....... 27

        A.  EPA's Subcategories Are Unlawful And Arbitrary. ............... 27

        B.  EPA Excluded The Best-Performing Boilers From Its Floor
        Analysis. ...................................................................................... 29

1. EPA's Exclusion Of The Best Boilers From Its Floor Analysis Was Unlawful And Arbitrary. .................................................29

2. EPA's Denial Of Reconsideration On This Issue Violates §7607(d)(7)(B). . ..................................................................31

C. Setting Floors At The "Upper Prediction Limit" Is Unlawful And Arbitrary. ..........................................................32

1. Section 7412(d)(3) Requires Floors To Reflect The Average Emission Level Actually Achieved By The Best-Performers. ...............33

2. The Emission Level EPA Expects All Future Tests By The Best Performers To "Fall Below" Is Not The Average Emission Level Actually Achieved By These Units. . ........................................34

a) The Upper Prediction Limit Is Not An Average. ..........................34

b) The Upper Prediction Limit Does Not Reflect What Any Units Actually "Achieved." ................................36

3. EPA's Reliance On The Upper Prediction Limit Was Arbitrary And Capricious. . ........................................................38

D. EPA'S New Rationale For The Upper Prediction Limit Is Unlawful And Arbitrary. ..........................................................41

1. This Court Should Not Entertain Or Defer To EPA's New Rationale. ..........................................................41

2. EPA's New Rationale For The Upper Prediction Limit Is Without Merit. . ..........................................................43

a) The *Post Hoc* Memo Offers No Comprehensible Interpretation of the Statutory Language. . ........................43

b) The *Post Hoc* Memo Offers No Basis to Conclude that the Upper Prediction Limit Produces an "Average." ..............45

c) The *Post Hoc* Memo Offers No Basis to Conclude that EPA'S Upper Prediction Reflects Emission Levels "Actually Achieved." ........................................................50

CONCLUSION ..........................................................52

CERTIFICATE REGARDING WORD LIMITATION

CERTIFICATE OF SERVICE

STATUTES AND REGULATIONS.............................Separately Bound

DECLARATIONS .........................................................Separately Bound

ii

## TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*Association of Battery Recyclers v. EPA*,
    208 F.3d 1047 (D.C. Cir. 2000) ......................................................... 22

*Cement Kiln Recycling Coalition v. EPA*,
    255 F.3d 855 (D.C. Cir. 2001) ................................................. 4, 26, 28

*Chevron U.S.A. Inc. v. NRDC*,
    467 U.S. 837 (1984) ......................................................................... 21

*Christensen v. Harris County*,
    529 U.S. 576 (2000) ......................................................................... 21

*Department of Treasury v. FLRA*,
    739 F.3d 13 (D.C. Cir. 2014) ........................................................... 44

*FCC v. Fox Television Stations*,
    556 U.S. 502 (2009) ................................................................... 47, 51

*Friends of the Earth v. Laidlaw Environmental Services (TOC)*,
    528 U.S. 167 (2000) ......................................................................... 21

*Halverson v. Slater*,
    129 F.3d 180 (D.C. Cir. 1997) ..................................................... 28, 36

*Hays v. Sebelius*,
    589 F.3d 1279 (D.C. Cir. 2009) ....................................................... 43

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004) ............................................................... 27, 33, 36

*Massachusetts v. DOT*,
    93 F.3d 890 (D.C. Cir. 1996) ....................................................... 37, 44

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ......................................................................... 31

*Mossville Environmental Action Now v. EPA*,
    370 F.3d 1232 (D.C. Cir. 2004) ....................................................... 38

\* Authorities upon which we chiefly rely are marked with an asterisk

iii

*Motor Vehicle Manufacturers Association. v. State Farm Mutual Automobile Insurance Co.*,
   463 U.S. 29 (1983)...............................................................21, 28, 40

*Mountain Communications v. FCC*,
   355 F.3d 644 (D.C. Cir. 2004).........................................................47

*\*National Association of Clean Water Agencies v. EPA*,
   734 F.3d 1115 (D.C. Cir. 2013)........................................... 8, 15, 16, 21, 28, 35,
                                                                          38-43, 45, 48, 49

*\*National Lime Association v. EPA*,
   233 F.3d 625 (D.C. Cir. 2000)...............................................3, 22, 23, 25

*Natural Resources Defense Council v. Daley*,
   209 F.3d 747 (D.C. Cir. 2000)...............................................39, 45, 46

*Natural Resources Defense Council v. EPA*,
   489 F.3d 1250 (D.C. Cir. 2007).........................................................4

*Natural Resources Defense Council v. EPA*,
   749 F.3d 1055 (D.C. Cir. 2014).........................................................22

*New Jersey v. EPA*,
   517 F.3d 574 (D.C. Cir. 2008).........................................................42

*New Jersey Department of Environmental Protection v. EPA*,
   626 F.2d 1038 (D.C. Cir. 1980)...............................................27, 37

*North Carolina v. EPA*,
   531 F.3d 896 (D.C. Cir. 2008)...............................................27, 28

*North Carolina v. EPA*,
   550 F.3d 1176 (D.C. Cir. 2008).........................................................27

*Northeast Maryland Waste Disposal Authority v. EPA*,
   358 F.3d 936 (D.C. Cir. 2004)...............................................28, 35

*Podewils v. NLRB*,
   274 F.3d 536 (D.C. Cir. 2001).........................................................40

*Public Citizen v. U.S. Department of Health and Human Services*,
   332 F.3d 654 (D.C. Cir. 2003).........................................................30

*Rettig v. Pension Benefit Guaranty Corporation*,
    744 F.2d 133 (D.C. Cir. 1984).........................................................30

*Sierra Club v. Costle*,
    657 F.2d 298 (D.C. Cir. 1981)....................................................42, 43

*Sierra Club v. EPA*,
    353 F.3d 976 (D.C. Cir., 2004)...........................................19, 22, 23, 25

*Sierra Club v. EPA*,
    479 F.3d 875 (D.C. Cir. 2007).................................. 3, 4, 8, 20, 26,30, 32, 34, 37

*Sierra Club v. EPA*,
    699 F.3d 530 (D.C. Cir. 2012).........................................................22

*Sierra Club v. EPA*,
    No. 98-1379, 2014 WL 2895930 (D.C. Cir. June 27, 2014) ............................28

*Sierra Club v. Jackson*,
    833 F. Supp. 2d 11 (D.D.C. 2012)......................................................5

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944).................................................................21

*Smith v. United States*,
    508 U.S. 223 (1993).................................................................33

*Utility Air Regulatory Group v. EPA*,
    134 S. Ct. 2427 (2014)..............................................................26

*Utility Air Regulatory Group v. EPA*,
    744 F.3d 741 (D.C. Cir. 2014)......................................................36

*Wos v. E.M.A.,*
    133 S. Ct. 1391 (2013).............................................................21

STATUTES

42 U.S.C. §7412(d) ..................................................................1, 2, 3

42 U.S.C. §7412(d)(1)..............................................................3, 27

42 U.S.C. §7412(d)(2)..........................................................................3

42 U.S.C. §7412(d)(3).........................................................3, 32, 34, 35

42 U.S.C. §7412(d)(3)(A)......................................................4, 29, 33

42 U.S.C. §7412(d)(3)(B) ...................................................4, 8, 29, 33

42 U.S.C. §7607(b)(1).........................................................................1

42 U.S.C. §7607(d)(3) – (d)(7)(A)....................................................42

42 U.S.C. §7607(d)(7)(B) .............................................................31, 32

42 U.S.C. §7607(d)(8)......................................................................32

42 U.S.C. §7607(d)(9)(D).................................................................32

## FEDERAL REGISTER NOTICES

59 FR 29,196 (Mar. 9, 1994) ...............................34, 35, 43, 44, 46

61 FR 48,208 (Sept. 12, 1996) ..........................................................34

64 FR 2611 (Jan. 15, 1999)................................................................34

66 FR 58,610 (Nov. 21, 2001) ...........................................................34

67 FR 30,848 (May 8, 2002)...............................................................34

67 FR 47,894 (July 22, 2002) .............................................................34

68 FR 1276 (Jan. 9, 2003)...................................................................34

68 FR 26,690 (May 16, 2003).............................................................34

75 FR 32,006 (June 4, 2010)..................................................3, 5, 7, 25

76 FR 15,608 (Mar. 21, 2011) ..................... 1, 4, 5, 6, 9, 10, 12, 35, 36, 38, 40

78 FR 7138 (Jan. 31, 2013)...............................................1, 2, 5, 6, 9, 25

# GLOSSARY OF ACRONYMS AND ABBREVIATIONS

Pursuant to Circuit Rule 28(a)(3), the following is a glossary of acronyms and abbreviations used in this brief:

| | |
|---|---|
| APA | Administrative Procedure Act |
| CATF | Clean Air Task Force |
| CO | Carbon Monoxide |
| EPA | Respondents U.S. Environmental Protection Agency and Gina McCarthy, Administrator |
| FR | Federal Register |
| ICAC | Institute of Clean Air Companies |
| NACAA | National Association of Clean Air Agencies |
| NACWA | National Association of Clean Water Agencies |
| NESCAUM | Northeast States for Coordinated Air Use Management |
| NRDC | Natural Resources Defense Council |
| PPM | Parts Per Million |
| RTC | Response to Comments |
| UARG | Utility Air Regulatory Group |
| UPL | Upper Prediction Limit |

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to review the final actions taken by EPA at 76 FR 15,608 (Mar. 21, 2011) and 78 FR 7138 (Jan. 31, 2013) and entitled "National Emission Standards for Hazardous Air Pollutants for Major Sources: Industrial, Commercial, and Institutional Boilers and Process Heaters; Final Rule." 42 U.S.C. §7607(b)(1). Petitioners filed timely petitions for review of these actions on May 20, 2011 and April 1, 2013, respectively.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are in a separate addendum.

## STATEMENT OF ISSUES

1.     Whether respondents (collectively "EPA" or "the agency") violated 42 U.S.C. §7412(d) or acted arbitrarily by failing to set emission standards, either directly or through a reasonable surrogate, for industrial boilers' emissions of polycyclic organic matter, polyaromatic hydrocarbons, formaldehyde, benzene, and other organic hazardous air pollutants.

2.     Whether EPA violated 42 U.S.C. §7412(d) or acted arbitrarily by creating subcategories of industrial boilers that are not based on any difference in class, type, or size.

3.     Whether EPA violated 42 U.S.C. §7412(d) or acted arbitrarily by excluding the best-performing boilers from its calculation of the statutory minimum stringency of its emission standards.

4.     Whether EPA violated 42 U.S.C. §7412(d) or acted arbitrarily by setting emission standards that do not reflect the average emission levels actually achieved by the boilers it identified as the relevant best-performing units.

## STATEMENT OF THE CASE

## I.     FACTUAL BACKGROUND.

There are approximately 14,000 industrial boilers operating in America. 78 FR 7155-56 tbl.5, JA____-__. They are used to generate heat and power at a wide variety of industrial facilities, and burn a wide variety of different materials as fuel, including natural gas, oil, coal, biomass, tires, industrial and municipal sludge, paper and paper residues, and plastics, as well as combinations of these and other materials. *See, e.g.*, EPA-HQ-OAR-2002-0058-3836 ("2012 Revised Floor Memo"), apps.A-1a(ii), A-1b(ii), JA____, ____.  Collectively, industrial boilers emit almost six tons of mercury and more than 4,000 tons of other metals (including arsenic, cadmium, chromium, and lead) every year. EPA-HQ-OAR-2002-0058-3383, app.B-5, JA____. They emit more than 50,000 tons per year of hydrocarbons and almost 30,000 tons per year of volatile organic compounds. *Id.* Among those emissions are such highly toxic organic pollutants as polycyclic

2

organic matter, formaldehyde, acetaldehyde, and benzene. 75 FR 32,006, 32,011/2 (June 4, 2010), JA_____. Congress identified polycyclic organic matter as a hazardous air pollutant of special concern in §7412(c)(6).

## II.    STATUTORY BACKGROUND.

Clean Air Act §7412(d) requires EPA to set emission standards for each hazardous air pollutant that a source category emits. 42 U.S.C. §7412(d)(1)-(2). *See Sierra Club v. EPA*, 479 F.3d 875, 883 (D.C. Cir. 2007) (*quoting Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 633-34 (D.C. Cir. 2000)). *See generally Sierra Club*, 479 F.3d at 877-79 (reviewing §7412 and cases construing it). EPA "may distinguish among classes, types, and sizes of sources" in setting standards, 42 U.S.C. §7412(d)(1), but each standard EPA promulgates must require the "maximum" degree of reduction in emissions that is "achievable" considering cost and other factors. *Id.* §7412(d)(2); *Sierra Club*, 479 F.3d at 877.

Regardless of cost, standards for new sources must be no "less stringent than the emission control that is achieved in practice by the best controlled similar source." 42 U.S.C. §7412(d)(3). Similarly, standards for existing sources in categories or subcategories with 30 or more sources must be no less stringent than the "average emission limitation achieved by the best performing 12 percent of sources (for which the Administrator has emissions information)," and standards for existing sources in categories or subcategories with fewer than 30 sources must

3

be no less stringent than "the average emission limitation achieved by the best
performing 5 sources (for which the Administrator has or could reasonably obtain
emissions information)." *Id.* §7412(d)(3)(A), (B). These minimum stringency
requirements unambiguously "require[] floors based on the emission level actually
*achieved* by the best performers (those with the lowest emission levels)." *Sierra
Club*, 479 F.3d at 880-81. EPA may not override the floor requirements with its
own notions about what is "achievable." *Id.* 877-79, 880-81; *Cement Kiln
Recycling Coalition v. EPA*, 255 F.3d 855, 861 (D.C. Cir. 2001) ("*Cement Kiln*").

## III.    REGULATORY BACKGROUND.

## A.    Regulatory History.

EPA initially promulgated §7412 standards for industrial boilers in 2004, but
many of them were "no-control" standards that violated the Clean Air Act.
Following this Court's decision in *Sierra Club*, EPA sought and obtained a
voluntary vacatur of the no-control standards in 2007, and this Court vacated the
remainder of the 2004 boilers rule shortly thereafter. *Natural Res. Def. Council v.
EPA*, 489 F.3d 1250 (D.C. Cir. 2007). *See* EPA Motion for Voluntary Partial
Vacatur and Remand, DN1031264, JA____ (*citing Sierra Club*).

In 2011, EPA promulgated replacement standards. 76 FR 15,608, JA____.
Although these standards were more than a decade overdue, EPA immediately
announced that it was reconsidering them and sought to stay their effectiveness

while it conducted reconsideration proceedings with no definite endpoint. *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 14, 33-34 (D.D.C. 2012). After its stay motion was denied, EPA issued the revised standards at issue here. 78 FR at 7138/2-3, JA____.

**B.    EPA's Refusal To Set Emission Standards For Organic Hazardous Air Pollutants.**

The challenged rule includes emission standards for mercury, hydrogen chloride, particulate matter, and carbon monoxide. 78 FR 7142 tbl.3, JA____. Apart from the mercury standards, all of these standards are for surrogates. At issue in this litigation is EPA's decision to use carbon monoxide as a surrogate for all the non-dioxin organic hazardous air pollutants, including polycyclic organic matter, polyaromatic hydrocarbons, benzene, and formaldehyde.[1] 75 FR at 32,018/2-3, 32,048/2, JA____, __. *See* EPA-HQ-OAR-2002-0058-3187.2 ("CATF Comments") 14-20, JA____-__; EPA-HQ-OAR-2002-0058-3511 ("Earthjustice Comments") 3-5, JA____-__.

EPA's rationale for choosing carbon monoxide as a surrogate was that "[b]ecause CO and organics are both products of poor combustion, it is logical to expect that limiting the production of CO would also limit the production of

--------------------------------------------------

[1] Polycyclic organic matter "is composed of 16 polycyclic aromatic hydrocarbons and extractible organic matter." 76 FR at 15,653/3, JA____.

organics." EPA-HQ-OAR-2002-0058-3289 ("2011 RTC") vol.2 at 16, JA____. In the final rule, however, EPA concluded that the relationship between carbon monoxide and organic hazardous air pollutants "breaks down" at carbon monoxide levels below 200 parts per million (ppm). 78 FR 7144/3-45/1, JA____-__. The agency further noted that, at carbon monoxide levels below 150 ppm, levels of one organic hazardous air pollutant (formaldehyde) "appear to increase." *Id.* 7145/1, JA____. Several of the floors EPA had calculated for carbon monoxide were well below this level. *See, e.g.*, 76 FR 80,598, 80,656 tbl.1, JA____ (showing carbon monoxide limit for new pulverized coal boilers to be 9 ppm). Rather than questioning its original assumption that carbon monoxide is a valid surrogate, however, EPA simply adjusted all the standards that were below 130 ppm up to 130 ppm. 78 FR 7145/1-2, JA____.[2]

## C.    EPA's Standard-Setting Approach.

After choosing the pollutants it would regulate, EPA determined the minimum stringency ("floor") for these standards under §7412(d)(3). For every standard for every subcategory, EPA set the standard at what it claims is the floor,

---

[2] Environmental groups submitted a petition for reconsideration pointing out that the adjusted carbon monoxide standards do not satisfy §7412(d)(3). EPA-HQ-OAR-2002-0058-3882 ("2013 Recon Petition") 1-3, JA____-__. EPA has not yet responded, but has agreed that it needs to reconsider the adjusted standards. EPA Motion to Govern, DN1450281 at 3.

the minimum stringency allowed by the Clean Air Act. *See* 75 FR 32,026-27,

32,029-30, JA____-__, ____-__.

EPA made several interrelated decisions that substantially weakened the

floors. First, the agency divided the boilers category into 36 different

subcategories. Second, the agency screened many of the best-performing units

within these categories out of its floor analysis. Third, among the sources it did not

screen out, EPA selected sources with high variability, rather than the overall

lowest emitters, as the "best-performing" sources on which it would base floors.

Fourth, EPA used a statistical formula called the "99 percent upper prediction

limit" ("UPL"). This formula "estimates what future values will be," such that "a

future test" from "any of [the best-performing] sources" will "fall below" the

emission limit "99 percent" of the time." EPA-HQ-OAR-2002-0058-3273

("Jan.2011 Floor Memo") 7, JA____. Fifth, EPA added a "fuel variability factor"

to its "upper prediction," inflating some of its floors further. *Id.* 15-17, JA____-__.

Although Environmental Petitioners contend that each of the above steps in

EPA's floor analysis was unlawful and arbitrary, this brief addresses only EPA's

decision to: (1) create subcategories that are not based on class, type or size; (2)

exclude the best-performing boilers from its floor analysis; and (3) set floors at a

99 percent upper prediction limit for the boilers it identified as best-performing,

7

rather than setting floors at the average emission level actually achieved by those units.

### 1. EPA's Use Of Subcategories.

Creating subcategories weakens floors in two ways. First, by creating more subcategories, EPA divides units into smaller groups with less variation in performance. For example, if EPA had a single category of 25 sources, existing source standards would be based on the top 5 sources, and all the other sources would have to reduce their emissions to match what these top performers achieved. 42 U.S.C. §7412(d)(3)(B). But if EPA divided that category into 5 subcategories with 5 sources each, every single source would be in the top 5 performers for its own subcategory and no source would have to reduce its emissions. *See* EPA-HQ-OAR-2002-0058-3525.1 ("2012 NACAA Comments") 14, JA____. *See also Sierra Club*, 479 F.3d at 885 (Williams, J., concurring) (noting that EPA can make floors less stringent by creating more subcategories); 2011 RTC vol.2 at 152-53, JA____-__ (comments urging EPA to make standards weaker by subcategorizing); *id.* 160-62, JA____-__ (same).

Second, as this Court observed in *National Association of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1144-45 (D.C. Cir. 2013) ("*NACWA*"), the results generated by EPA's upper predition approach depend heavily "on the size of the dataset." Creating more subcategories makes the dataset for each subcategory

8

smaller, causing EPA's statistical approach to generate higher (*i.e.*, weaker) floors. *Id. See* 2012 NACAA Comments 14, JA____.

In this rulemaking, EPA created a total of 36 different subcategories. 78 FR 7141/3, 7193-99 tbls.1-2, JA____, ____-__. For purposes of its mercury and hydrogen chloride standards, the agency created 6 subcategories for new and existing units "designed to burn" solid fuel, liquid fuel, and certain gases. *Id.* For purposes of its particulate matter and carbon monoxide standards, the agency established 30 additional subcategories based both on the fuel that units are "designed to burn" and on alleged design differences. *Id.*

EPA's definitions of the various "designed to burn subcategories" turn on the fuel that a given boiler is currently burning, rather than on any differences in class, type, or size. For example, EPA defines a "unit designed to burn solid fuel" to mean "any boiler or process heater that burns only solid fuels **or at least 10 percent solid fuel on an annual heat input basis in combination with liquid fuels or gaseous fuels**." *Id.* 7193/1, JA____ (emphasis added). Thus, a unit in the "designed to burn" solid fuel subcategory may actually derive up to 90 percent of its annual heat input from natural gas or liquid fuel. Similarly, EPA defines a "unit designed to burn biomass" to "include[] any boiler … that burns **at least 10 percent biomass or bio-based solids on an annual heat input basis in combination with solid fuels, liquid fuels, or gaseous fuels**." 76 FR 15,686/1,

9

JA____ (emphasis added). Thus, a unit in this subcategory may actually derive up to 90 percent of its annual heat input from coal, oil, or gas. EPA states that units can "switch subcategories based on their actual annual heat input." Jan.2011 Floor Memo 6, JA____. *See* 2012 NACAA Comments 27, JA____; CATF Comments 3-8, JA____-__.

## 2. EPA's Selection Of The Top Boilers.

Despite the "explosion in the number of subcategories" in the boilers rule, 2012 NACAA Comments 13, JA____, industry commenters complained that some sources in the "designed to burn" subcategories would still have worse emissions than others. 76 FR 15,636/1-2, JA____. For example, burning natural gas or even coal tends to generate less carbon monoxide than burning biomass. *Id.* 15,635/3, JA____. Thus, sources burning more biomass in the "designed to burn biomass" subcategory complained about having to meet a carbon monoxide standard based, in part at least, on the performance of sources in that subcategory that chose to burn less biomass and more gas or coal. *Id.*

Responding to those complaints, EPA altered its floor approach for the 2013 standards. Rather than basing floors on the best-performing units in each subcategory, EPA based floors for existing sources only on data from units burning 90 percent of the specified fuel at the time of their emissions test. EPA-HQ-OAR-

10

2002-0058-3387 ("Nov.2011 Floor Memo") 4-5, JA____-__.[3] *See* EPA-HQ-OAR-2002-0058-3297 ("2011 Reconsideration Petition") 4, JA____; Earthjustice Comments 1-2, JA____-__. For example, although EPA defined the "designed to burn" biomass categories to include units burning up to 90 percent natural gas, the agency based the existing source floors for this category only on boilers that were burning 90 percent biomass. Nov.2011 Floor Memo 4, 12, JA____, ____.

The record shows that EPA's approach screened out many of the best-performing boilers. For example, in setting the particulate matter floor for units in the "suspension burners designed to burn biomass" category, EPA screened out the two best-performing units because they were "co-firing biomass with natural gas." *Id.* 12, JA____. Similarly, in setting the carbon monoxide floor for heavy liquids, EPA screened out the best-performing unit because it was "co-firing #6 fuel oil with natural gas." *Id.* The record shows that, similarly, many other boilers that burn a combination of fuels were identified as best-performing in 2010 but then dropped from EPA's floor analysis in 2012. *Compare* Nov.2011 Floor Memo app.B, JA____ *with* 2012 Floor Memo app.B, JA____. *See* Declaration of Dr. Ranajit Sahu ("Sahu Declaration") ¶¶13-15, Attachment B.

_____

[3] For new sources, EPA considered only units burning 100 percent of the specified fuel. *Id.* 12, JA____.

Having screened many of the best sources out of consideration, EPA proceeded to rank the remaining sources by their single lowest emission test. Nov.2011 Floor Memo 4, 11, JA____, ____.

### 3.     EPA's 99 Percent Upper Prediction.

When it came to setting floors based on the chosen boilers' performance, however, EPA no longer defined their performance by their single lowest test results. Instead, EPA used a dataset comprised of all the individual test runs for all the units it had chosen as the best-performing 12 percent or best-performing 5 units. Jan.2011 Floor Memo 6-7, JA____-__.[4]

To each of these datasets, EPA applied its 99 percent upper prediction limit formula to predict a number that any future emission test by any boiler within the given dataset would "fall below*." Id.* 7, JA____. EPA explained "if we were to randomly select a future test condition from any of these sources (*i.e.*, average of three runs), we can be 99 percent confident that the reported level will fall below a MACT floor emission limit calculated using a UPL." *Id.*[5]

---

[4] Although EPA used individual test run data to set the floors, the agency states that sources "demonstrate compliance with the MACT floor using the average of a three-run test." *Id.* 7, JA____. *See* NACAA Comments 11, JA____.

[5] The higher the confidence level EPA chooses, the higher its upper prediction limit becomes. For example, a 99.9 percent upper prediction limit would be higher than a 99 percent upper prediction limit. *See* 76 FR 15,628/1-2, JA____.

12

EPA received comments that the standards for new boilers did not reflect the emission control achieved in practice by the best controlled unit in each subcategory. CATF Comments 29-36, JA____-__. EPA agreed that the 99 percent upper prediction limit "is not a measure of performance of the source." 2011 RTC vol.1 at 769, 929, JA____, ____. The agency cautioned that, for just this reason, the upper prediction limit "should be not used to rank the sources and identify the best performing units." *Id.*

EPA also received comments pointing out that its floors for existing boilers do not reflect the "average" emission level achieved by the best performers in each subcategory. *See* EPA-HQ-OAR-2002-0058-2527 1-2, JA____-__; 2012 NACAA Comments 14-18, JA____-__; CATF Comments 24-26, JA____-__; EPA-HQ-OAR-2002-0058-2937 ("ICAC Comments") 6-10, JA____-__. In response, EPA did not claim that its floors reflect the "average" emission level achieved by the best-performing 12 percent of boilers. Instead, the agency confirmed that it set floors at a level no boiler in the top 12 percent would exceed because it believes that is a "reasonable approach for this rule." 2011 RTC vol.1 at 919-20, JA____-__.

The result of EPA's floor approach is floors that do not reflect the average emission level actually achieved by the best performing sources. Two examples, comparing EPA's floors to the underlying data EPA used to set those floors, are

13

below. Nov.2011 Floor Memo apps.C-2(f)(i), JA_____(particulate matter), C-1(a)(1), JA_____ (mercury).





**4.** *NACWA* **And EPA's** *Post Hoc* **Rationale For The 99 Percent Upper Prediction.**

After EPA issued its final 2013 Rule, this Court addressed the agency's

upper prediction approach in the context of another air toxics rule that EPA had

issued for sewage sludge incinerators under the virtually identical floor language of

Clean Air Act §7429(a)(2). *NACWA*, 734 F.3d at 1139-45. The Court found EPA

seemed to have interpreted "'average emissions limitation achieved by the best

15

performing 12 percent' … to refer to the future average of a 3-run test that EPA

predicts a source in the best-performing 12 percent will fall below with 99 percent

confidence." *Id.* 1142. It then held

> Although EPA may be able to justify its novel interpretation that
> "average" means the average of a future three run compliance test,
> one sentence in the Federal Register is not enough of a basis to uphold
> EPA's new approach to incorporating variability against arbitrary and
> capricious review. Accordingly, on remand, we expect EPA to clarify
> **how** the upper prediction limit represents the "average emission
> limitation achieved by the best performing 12 percent.

*Id.* 1143 (emphasis added).

The Court also noted that the upper prediction limit produces an "apparently

illogical result." *Id.* 1144. For example, EPA predicted a "higher MACT floor for

an incinerator with raw test data ranging from 0.31 to 2.26 than for a group of

incinerators with raw test data ranging from 0.31 to 40.32 and a mean of 9.38." *Id.*

The Court remanded on this issue as well, observing "[w]e are hesitant to rubber-

stamp EPA's invocation of statistics without some explanation of the underlying

principles or reasons why its formulas would produce an accurate result,

particularly when the 'facts found'—the MACT floor datasets—demonstrate flaws

in the formula." *Id.* 1144-45.

Based on *NACWA*, EPA moved for a partial remand in the present case. EPA

Motion for Remand of the Record, DN1482091 at 1-2, JA____-__. With respect to

all the standards for which its upper prediction limit did not yield the same illogical

16

result identified in *NACWA*, however, EPA sought only a remand of the record. *Id.* 9-10.[6] EPA refused to consider making any changes to these standards or to accept comment on its response to the remand. The agency represented that its response to the remand would merely clarify its rationale for the upper prediction limit, not advance a different rationale or add new data to the record. EPA Reply in Support of Remand, DN1487283 at 4, 6-7, JA____, ____-__. The Court granted EPA's motion. Order of May 15, 2014, DN1493171.

In its response to the remand, however, EPA disavowed the statutory interpretation that this Court ascribed to it in *NACWA*. EPA-HQ-OAR-2002-0058-3892 ("Page Memo") 3, JA____.[7] EPA now states it does not interpret "average" to mean "the average of a future 3-run compliance test" but, rather, "interprets the average to mean the average emissions over time." *Id.* EPA then claims variously that the upper prediction limit:

- represents "the **average level** expected to have been achieved over time" by the relevant sources. *Id.* 4, JA____ (emphasis added); and

- represents a level of emissions EPA does not expect the **average source** to exceed. *Id.* 4, 6, 10, JA____, ____, ____.

---

[6] The remaining standards, for which EPA sought an ordinary remand, are not at issue in the present case.

[7] EPA did not seek rehearing or otherwise contest the Court's decision in *NACWA*.

17

EPA's rationale for both of these claims is that "the first element of the UPL equation is the average of the short-term emissions test data from the best performing units." *Id.* 4, JA____. The equation to which EPA refers is:

$$UPL_{100-(\alpha \times 100)} = \bar{x} + t_{(n-1),(1-\alpha)}\sqrt{s^2\left(\frac{1}{m} + \frac{1}{n}\right)}$$

*Id.* 10, JA____. EPA states the "first element," $\bar{x}$, represents the "average," and "the second half of the equation addresses the variability of that emissions level based on the factors identified in the variables in that portion of the equation." *Id.* 11, JA____.[8]

EPA also uses the new memorandum to advance new factual claims. Although EPA previously acknowledged that its floor approach predicts the level that "future" tests would fall below, *e.g.*, 2011 RTC vol.1 at 929, JA____, the agency now claims it also is a "predict[ion]" of "past" and "present" performance. Page Memo 4, 10, JA____, ____. Further, EPA imports new data from the sewage sludge incinerator rule, and argues that these data show its upper prediction approach in the boilers rule is "reasonable." *Id.* 12-14, JA____-__.

---

[8] EPA provides a different equation for situations where the data are not normally distributed.

18

## SUMMARY OF ARGUMENT

**Carbon Monoxide As A Surrogate.** Contrary to EPA's claim, carbon monoxide is not a reasonable surrogate for organic hazardous air pollutants. First, the record shows that some organic hazardous air pollutants – including polycyclic organic matter and polyaromatic hydrocarbons – are not reduced by the measures that sources use to control emissions of carbon monoxide and are reduced by other measures. Second, EPA refuses to set carbon monoxide floors at the levels that §7412(d)(3) requires because it claims such floors would not be representative of the best-performing boilers' emissions of organic hazardous air pollutants. For both reasons, using carbon monoxide as a surrogate does not allow EPA to identify "the best achieving sources, and what they can achieve" with respect to organic hazardous air pollutants. *Sierra Club*, 353 F.3d 976, 985 (D.C. Cir, 2004).

**EPA's Subcategories.** EPA has set separate standards for sources that are not of different classes, types, or sizes. EPA's rationale for these subcategories does not even speak to the statutory standard, and confirms that the agency exceeded its statutory authority in creating them.

**EPA's Exclusion Of The Best-Performing Sources.** Having chosen to create subcategories that include units burning a wide variety of different fuels, EPA then screened out the units within these subcategories that burn cleaner fuels and achieve better emission levels. By doing so, EPA violated §7412(d)(3) and

19

flouted this Court's holding that "section 7412(d)(3) requires floors based on the emission level actually *achieved* by the best performers (those with the lowest emission levels)." *Sierra Club*, 479 F.3d at 880-81.

      **Upper Prediction Limit.** Although §7412(d)(3) unambiguously requires floors to reflect "average" emission level actually "achieved" by the best-performing 12 percent of units, EPA set floors at the upper prediction limit for the sources it claimed were the best performers. As EPA itself made clear, the upper prediction limit is the level EPA expects any "future" test by any source in the top 12 percent to "fall below." Thus it is neither an "average" nor any measure of what these sources actually "achieved." EPA's claim that it has discretion to set such standards is unlawful under *Chevron* analysis. Further, EPA has failed to demonstrate with substantial evidence that its floors reflect the average emission level actually achieved by the best-performing sources, and record evidence strongly indicates that they do not reflect this level.

      **EPA's *Post Hoc* Rationale.** In attempt to salvage its floor approach after *NACWA*, EPA sought and obtained a voluntary remand of the record. Despite representing that it would not do so, EPA used the opportunity to advance a completely different statutory interpretation than the one addressed in *NACWA*, to make new factual arguments, and to introduce new data – all without providing notice or opportunity for comment. The Court should not even entertain this end-

20

run around the Clean Air Act's notice requirements. In any event, EPA's new rationale fails to "clarify how the upper prediction limit represents the 'average emissions limitation achieved by the best performing 12 percent.'" *NACWA*, 734 F.3d at 1143.

## STANDARD OF REVIEW

Under *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984), this Court rejects agency statutory interpretations that are either contrary to the "unambiguously expressed intent of Congress" or unreasonable. 467 U.S. at 842-43.  Interpretations issued without notice-and-comment opportunity and lacking the force of law "do not warrant *Chevron*-style deference," and are entitled to respect only "'in proportion to their 'power to persuade.'" *Wos v. E.M.A.*, 133 S. Ct. 1391, 1402 (2013) (*quoting Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944) and *citing Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (quotations omitted)).

The Court reviews EPA's actions and decisions under the "arbitrary and capricious" standard. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## STANDING

Environmental Petitioners have standing to bring this suit on behalf of their members. *See Friends of the Earth v. Laidlaw Envtl. Servs. (TOC)*, 528 U.S. 167,

21

181 (2000). Environmental Petitioners' members live, work, and recreate near

boilers regulated by the boilers rule. They are exposed to toxic air emissions from

boilers, and suffer other harm including additional health risks and a diminished

ability to engage in and enjoy recreational and aesthetic interests. *See* Declarations.

Because the boilers rule does not reduce these emissions as required by the Clean

Air Act, it prolongs and increases this harm. The Court may redress these injuries

by ordering EPA to follow the Clean Air Act on remand. *See, e.g.*, *NRDC v. EPA*,

749 F.3d 1055, 1062 (D.C. Cir. 2014); *Ass'n of Battery Recyclers v. EPA*, 716 F.3d

667, 672-73 (D.C. Cir. 2013); *Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir.

2012).

## ARGUMENT

### I.     CARBON MONOXIDE IS NOT A REASONABLE SURROGATE FOR ORGANIC HAZARDOUS AIR POLLUTANTS.

Clean Air Act §7412(d) creates a "clear statutory obligation to set emission

standards for each listed [hazardous air pollutant]" that a source category emits.

*National Lime Ass'n*, 233 F.3d at 634. Although EPA may use surrogates to meet

this obligation "if it is 'reasonable' to do so," *id.* 637, a surrogate is not reasonable

if "the best achieving sources, and what they can achieve with respect to HAPs,

might not be properly identified," *Sierra Club*, 353 F.3d at 985. Thus, *National*

*Lime Ass'n* and *Sierra Club* both hold that particulate matter is a reasonable

22

surrogate for metals **only** "assuming … that PM control technology indiscriminately captures HAP metals along with other particulates" and "[i]f PM control is the **only** means by which facilities 'achieve' reductions in HAP metal emissions." *National Lime Ass'n*, 233 F.3d at 639 (emphasis added); *Sierra Club* 353 F.3d at 985.

The record shows that controlling carbon monoxide does not indiscriminately reduce emissions of all organic hazardous air pollutants. As noted above, EPA's rationale for using carbon monoxide as a surrogate for organic hazardous air pollutants, is that "[b]ecause CO and organics are both products of poor combustion, it is logical to expect that limiting the production of CO would also limit the production of organics." 2011 RTC vol.2 at 16, JA____. EPA recognized that carbon monoxide is not a valid surrogate for dioxins, however, because dioxins "are produced by mechanisms (often catalytic**) downstream of the combustion zone and are not related to the amount of CO present in the flue gas**." *Id.* (emphasis added). The same is true for other organic hazardous air pollutants that form outside the combustion unit. In particular,

> Most of the particulate organic compounds … form primarily downstream of the combustion chamber, as do dioxin/furans. This is far from the same mechanism by which CO is formed. Several of these compounds are not products of incomplete combustion like CO, but rather are formed via distinct chemical reaction pathways. Polynuclear aromatic hydrocarbons] are formed in condensation reactions, for example.

23

CATF Comments 16-17, JA____-__. Thus, levels of carbon monoxide can actually **increase** while levels of these organic pollutants **decrease**, and vice versa. EPA-HQ-OAR-2002-0058-2741 ("Southern Company Comments") 10-12, JA____-__ (addressing polycyclic aromatic hydrocarbons). *See also* ICAC Comments 20-22, JA____-__ (measures used to reduce carbon monoxide do not necessarily reduce organic hazardous air pollutants). EPA does not disagree.

Moreover, organic hazardous air pollutants are reduced by means other than those that reduce carbon monoxide emissions. For example, emissions of polycyclic organic matter, polyaromatic hydrocarbons, and other organic HAPs can be reduced by using cleaner fuels, such as natural gas and distillate oil. 2011 RTC vol.2 at 19-20, JA____-__ (CATF comment). Further, "[a] boiler operator can control organic [hazardous air pollutants] with the addition of activated carbon used for controlling mercury." *Id.* 43 (ICAC Comments). And organic hazardous air pollutants can be "decreased drastically" by increasing flame temperatures in the combustion process, an adjustment that actually increases carbon monoxide emissions. *Id.* 40-41, JA____-__ (Southern Company Comment). Again, EPA does not disagree.

In short, using carbon monoxide as a surrogate does not allow EPA to identify "the best achieving sources, and what they can achieve with respect to" polycyclic organic matter, polyaromatic hydrocarbons, and other organic

24

hazardous air pollutants that form outside the combustion units. *Sierra Club*, 353 F.3d at 985. For this reason alone, carbon monoxide is not a reasonable surrogate.

In addition, EPA admits that, at carbon monoxide levels well above those achieved by the best-performing boilers in many subcategories, there is a "breakdown" in the relationship between carbon monoxide emissions and emissions of organic hazardous air pollutants. 78 FR at 7145/1. *See supra* 6. Pointing out that decreases in carbon monoxide emissions do not yield decreases in emissions of organic hazardous air pollutants and may translate to increases at these levels, EPA found that it could not set meaningful floors at the carbon monoxide levels that – according to the agency itself – are achieved by the relevant best-performing boilers. 78 FR at 7145/1. That carbon monoxide cannot function as a surrogate at the very levels EPA itself claims are the floors dictated by §7412(d)(3) further demonstrates that carbon monoxide does not allow EPA to identify "the best achieving sources, and what they can achieve with respect to" any organic hazardous air pollutants. *Sierra Club*, 353 F.3d 985.

EPA argues that "[e]stablishing emission limits for specific organic HAP (with the exception of [dioxins]) would be impractical and costly." 75 FR at 32,018/3, JA____. But setting standards for each hazardous air pollutant that boilers emit is EPA's "clear statutory obligation." *National Lime Ass'n*, 233 F.3d at 633-34. If EPA cannot meet this obligation through using carbon monoxide as a

surrogate – and EPA plainly cannot do so because carbon monoxide is not a reasonable surrogate – the agency must come up with another regulatory approach "capable of producing floors that satisfy the Clean Air Act." *Cement Kiln*, 255 F.3d at 865. That may mean setting some additional emission limits (even if EPA regards it as "impractical and costly") or using different surrogates, or some combination of these approaches. But if EPA wishes to be released from its "clear statutory obligation," the agency must take its concerns to Congress, not this Court. *See Sierra Club*, 479 F.3d at 884. *See Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2446 (2014) ("An agency confronting resource constraints may change its own conduct, but it cannot change the law.").

Finally, EPA's choices were not limited to setting a carbon monoxide standard on the one hand and setting individual standards for each either directly or through valid surrogates of the organic hazardous air pollutants that boilers emit on the other, as the agency implies. Among other things, EPA could have set separate standards for the organic hazardous air pollutants like polycyclic organic matter that, like dioxins, are formed outside the combustion unit. For other organic hazardous air pollutants, the agency could have evaluated a more representative surrogate such as benzene as the Southern Company suggested. 2011 RTC vol.2 at 40-41, JA____-__; Southern Company Comments 10-12, JA____-__.

## II.    EPA'S FLOOR APPROACH IS UNLAWFUL AND ARBITRARY.

## A.    EPA's Subcategories Are Unlawful And Arbitrary.

EPA insists it has broad discretion to subcategorize sources based solely on the fact that they "do burn different fuels or a mixture of fuels at certain times." EPA-HQ-OAR-2002-0058-3846 ("2013 RTC") 559, JA____. Section 7412(d)(1), however, authorizes only distinctions based on "different classes, types, and sizes." 42 U.S.C. §7412(d)(1). Because boilers are not of a different class, type, or size just because they happen to be burning different fuels at a given time, EPA's claim of discretion "substitut[es] EPA's desires for the plain text" of the statute. *New Jersey v. EPA*, 517 F.3d 574, 582 (D.C. Cir. 2008). *See also North Carolina v. EPA*, 531 F.3d 896, 919 (D.C. Cir. 2008), *revised on other grounds*, 550 F.3d 1176 (D.C. Cir. 2008) ("An agency may not trespass beyond the bounds of its statutory authority by taking other factors into account than those to which Congress limited it.") (internal quotation marks and citation omitted).

Indeed, EPA admits that a unit can "switch subcategories" just by changing the fuel mix it burns. Jan.2011 Floor Memo at 6, JA____. If §7412(d)(1)'s reference to **different** "classes, types, or sizes" source allows EPA to set separate standards for the very **same** unit based solely on the fact that it is burning a different mix of fuels it serves no purpose at all. *See Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004) ("we must give effect to every word of a statute wherever possible");

27

*North Carolina*, 531 F.3d at 910 ("All the policy reasons in the world cannot justify reading a substantive provision out of a statute."). *See also Halverson v. Slater*, 129 F.3d 180, 189 (D.C. Cir. 1997) (interpretation that deprives statutory provision "of virtually all effect" unreasonable under *Chevron* step two).

EPA's subcategories are also arbitrary. EPA's primary argument is that no one has proved that "boilers burning different fuels are in fact the same." 2013 RTC 559, JA____. But EPA admits that boilers can "switch subcategories based on their actual annual heat input" – *i.e.*, by choosing to burn different fuels. Jan.2011 Floor Memo 6, JA____. Under EPA's own definitions, a unit "designed to burn" coal one year can become a unit "designed to burn" biomass the next. These definitions alone make plain that EPA's subcategories distinguish between boilers that are not of a different class, type or size. *See State Farm*, 463 U.S. at 43 (action is arbitary where agency's explanation "runs counter to the evidence before the agency").

Further, if EPA wishes to create subcategories for different units, the agency must demonstrate with substantial evidence – not "mere assertions" – that they are of different classes, types, or sizes. *See NACWA*, 734 F.3d at 1131, 1136-37 (*citing Cement Kiln*, 255 F.3d at 866; *Ne. Md. Waste Disposal Auth. v EPA*, 358 F.3d 936, 954 (D.C. Cir. 2004)). *See also Sierra Club v. EPA*, No. 98-1379, 2014 WL 2895930, *11 (D.C. Cir. June 27, 2014) (EPA retains duty to examine key

28

assumptions underlying its rule, including the assumption that it is acting within statutory authority). EPA does not even claim that boilers alter their "class[], type[], or size[]" just by choosing to burn a different fuel, let alone provide a record basis for that notion.

## B.    EPA Excluded The Best-Performing Boilers From Its Floor Analysis.

### 1.    EPA's Exclusion Of The Best Boilers From Its Floor Analysis Was Unlawful And Arbitrary.

Clean Air Act §7412(d)(3) unambiguously requires floors to reflect the actual performance of the relevant best-performing sources in each subcategory. 42 U.S.C. §7412(d)(3)(A), (B). Nonetheless, EPA screened the best-performing boilers out of its floor analysis for many subcategories solely because they were not burning 90 percent or 100 percent of certain specified fuels. *See supra* 10-11. For example, although EPA's "suspension burner designed to burn biomass" subcategory includes units that burn up to 90 percent natural gas, the agency screened the "top two ranked units" in this subcategory out of its floor analysis for the particulate matter standards because they were "firing biomass with natural gas" at the time of their emissions test. Nov.2011 Floor Memo 12, JA____. *See supra* 11. By basing floors on boilers that were burning a particular fuel mix – and not the best-performing boilers in each subcategory – EPA violated §7412(d)(3).

29

EPA also flouted this Court's holding in *Sierra Club*. There, in a closely similar attempt to avoid §7412(d)(3)'s floor requirements, EPA screened the best performing brick kilns out of its floor analysis because they were not using a particular control technology ("DLA technology"). *Sierra Club*, 479 F.3d at 880-81. The agency argued that §7412(d)(3) left it free to determine that the "best-performing sources" are those using a chosen control technology and not the sources achieving the lowest emission levels. *Id. See* Respondent Brief 24-28, *Sierra Club*, 479 F.3d 875 (03-1202), JA____-__. This Court rejected EPA's argument under *Chevron* step one: "EPA cannot circumvent *Cement Kiln*'s holding that section 7412(d)(3) requires floors based on the emission level actually *achieved* by the best performers (those with the lowest emission levels)." *Sierra Club*, 880-81.

Here, EPA does not dispute that it screened out the best-performing boilers in several subcategories. Further, it provides no statutory interpretation to support its exclusion of these sources. *See Public Citizen v. U.S. Dept. of Health and Human Services,* 332 F.3d 654, 661 (D.C. Cir. 2003) ("even if we were prepared to accord *Chevron* deference … that document contains no interpretation of [the statute] to which we might defer"); *Rettig v. Pension Benefit Guar. Corp.*, 744 F.2d 133, 151 (D.C. Cir. 1984) (interpretation is unreasonable under *Chevron* step two where agency failed to "consider[] matter in a detailed and reasoned fashion").

30

Further, because EPA has not even attempted to square excluding these sources

with the statutory mandate, its approach is arbitrary and capricious. *See*

*Massachusetts v. EPA*, 549 U.S. 497, 535 (2007) ("EPA must ground its reasons

for action or inaction in the statute.").

## 2.    EPA's Denial Of Reconsideration On This Issue Violates §7607(d)(7)(B).

The record contains a lengthy "Response" to a comment that EPA violated

the Clean Air Act by excluding the best-performing sources from its floor analysis.

2013 RTC 558-59, JA____-__ (summarizing comment); *Id.* 559-64, JA____-__

(EPA "Response"). Yet EPA also states that it denied reconsideration on this issue.

*Id.* 559, JA____. Because objections to this aspect of EPA's floor approach

objection were squarely raised in comments on the revised standards that EPA

proposed in December 2011, Earthjustice Comments 1-2, JA____-__, these

objections can be raised in the present case. 42 U.S.C. §7607(d)(7)(B). It is

irrelevant whether EPA believes it granted or denied reconsideration on its original

rule.

If the Court finds that EPA denied reconsideration and that the issue is not

properly before it, however, it should also find that EPA's refusal to reconsider the

issue violates §7607(d)(7)(B). EPA excluded boilers that were not burning 90

percent or 100 percent of the specified fuel from its floor analysis only after

issuing its 2011 final rule. *See* 2011 RTC vol.1 at 899-900, JA____-__. Because it

was impracticable to raise an objection to this aspect of EPA's floor approach

during the public comment period for that rule, Sierra Club petitioned for

reconsideration. EPA-HQ-OAR-2002-0058-3297 ("2011 Petition for

Reconsideration") 4, JA____ (*citing* 2011 RTC vol.1 at 899-900, JA____-__).

Under these circumstances, §7607(d)(7)(B) provides that EPA "shall convene a

proceeding for reconsideration of the rule." Assuming *arguendo* both that EPA

denied reconsideration on this issue and that the agency did not open the issue for

public comment by proposing revised standards in December 2011, EPA's denial

of reconsideration contravenes §7607(d)(7)(B). *Id.* EPA's standards would have

been substantially stronger had EPA included the best-performing sources in its

floor analysis. *See* 42 U.S.C. §7607(d)(8), (d)(9)(D). *See supra* 11; Sahu

Declaration ¶¶13-15, Attachment B.

**C.    Setting Floors At The "Upper Prediction Limit" Is Unlawful And Arbitrary.**

The Clean Air Act requires floors to reflect the "average" emission level

actually "achieved" by the best-performing 12 percent of sources. 42 U.S.C.

§7412(d)(3); *Sierra Club*, 479 F.3d at 880-881. EPA's 99 percent upper prediction

limit does not reflect this "average" emission level. Nor does it reflect what any of

the best-performing sources actually "achieved."

**1.    Section 7412(d)(3) Requires Floors To Reflect The Average Emission Level Actually Achieved By The Best-Performers.**

Clean Air Act §7412(d)(3) unambiguously requires floors to reflect the "average" emission level achieved by the relevant best-performing sources. 42 U.S.C. §7412(d)(3)(A), (B). By using the word "average," Congress demanded a measure of ordinary, usual perfomance – a central tendency – of the "emissions limitation achieved by the best performing 12 percent of the existing sources." 42 U.S.C. §7412(d)(3)(A). *See* WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY (1971) 61 (defining "average" to mean "equaling an arithmetic mean," "approximating or resembling an arithmetic mean in being about midway between extremes," or "not out of the ordinary"). *See, e.g.*, *Leocal*, 543 U.S. at 9 ("When interpreting a statute, we must give words their 'ordinary or natural' meaning.") (*quoting Smith v. United States*, 508 U.S. 223, 228 (1993)). EPA itself has formally adopted an "interpretation of average emission limitation" acknowledging "that it is a measure of **central tendency**, such as the arithmetic mean or the median." 68 FR 26,690, 26,700/1 (May 16, 2003), JA____ (emphasis added). *See* 59 FR 29,196, 29,199 (Mar. 9, 1994), JA____ (formal rule-making establishing that "EPA construes the word 'average' in section 112(d)(3) to

33

authorize the Agency to use any reasonable method, in a particular factual context, of determining the **central tendency** of a data set") (emphasis added).[9]

Section 7412(d)(3) also unambiguously requires that floors reflect the emission level actually "achieved" by the relevant best-performing sources. Speaking consistently in the past tense, Congress used the word "achieved" 4 times in this provision. 42 U.S.C. §7412(d)(3). And, as this Court has held, Congress meant what it said: "section 7412(d)(3) requires floors based on the emission level actually *achieved* by the best performers." *Sierra Club*, 479 F.3d at 880-81.

To satisfy the Clean Air Act, therefore, existing source floors must reflect the average (*i.e.*, a "central tendency") of the emission levels "actually achieved" by the relevant best-performing sources.

## 2.     The Emission Level EPA Expects All Future Tests By The Best Performers To "Fall Below" Is Not The Average Emission Level Actually Achieved By These Units.

### a)     The Upper Prediction Limit Is Not An Average.

Where EPA chooses to estimate the average emission level achieved by the best-performing sources, the agency must "demonstrate with substantial

---

[9] EPA has consistently reaffirmed that interpretation in its rulemakings. *E.g.*, 68 FR 1276, 1286/3 (Jan. 9, 2003), (Plywood); 67 FR 47,894, 47,909/1 (July 22, 2002) (Clay Ceramics); 67 FR 30,848, 30,853/1 (May 8, 2002) (Semiconductors); 66 FR 58,610, 58,618/2 (Nov. 21, 2001) (Asphalt processing); 64 FR 2611, 2612/2 (Jan. 15, 1999) (Natural Gas Transmission & Storage); 61 FR 48,208, 48,210/1 (Sept. 12, 1996) (Polymers & Resins).

evidence—not mere assertions" that its floor approach satisfies the Clean Air Act's floor requirements. *NAWCA*, 734 F.3d at 1131, 1136-37. Having chosen to set floors at the 99 percent upper prediction limit in the boilers rule, EPA had to demonstrate with substantial evidence that this approach yields floors reflecting the "average" emissions limitation actually "achieved" by the relevant best-performing boilers, 42 U.S.C. §7412(d)(3). *NAWCA*, 734 F.3d at 1131; *Ne. Md. Waste*, 358 F.3d at 954.

EPA did not even attempt to provide such a demonstration. Instead, the agency claimed discretion to set floors at a level it expects all the sources in the top 12 percent to meet at all times. 76 FR 15,630/1, JA____; 2011 RTC vol.1 at 919-20, JA____-__. Reflecting that interpretation, EPA's upper prediction is not an "average." Rather, by EPA's own description, it is a level EPA expects any future compliance test by "any" boiler in the top 12 percent to "fall below." Jan.2011 Floor Memo 7, JA____.

Given its ordinary meaning and the meaning EPA itself has adopted through notice-and-comment rulemaking, "the word 'average' in [§7412(d)(3)]," allows EPA only to use a "reasonable method . . . of determining the central tendency of a data set." 59 FR at 29,199, JA____. A level that EPA expects 99 out of 100 future tests by any source in the top 12 perent to "fall below" is not a measure of the "central tendency" of the emission levels achieved by this group of boilers. Rather,

35

it is a measure of one extreme, an upper limit on what any of those boilers might emit in a future test. Jan.2011 Floor Memo 7, JA____. *See supra* 13-15.

Indeed, under EPA's interpretation, the agency is free to call any measure of the top 12 percent an "average." EPA already has asserted discretion not only to call the 99 percent upper prediction limit an "average" but also to call the 99.9 percent upper prediction limit an "average." 76 FR 15,628/2, JA____. And nothing in the agency's interpretation of the statute would prevent it from similarly claiming that the "average" is a 99.9999 percent upper prediction limit that any source in the top 12 percent will fall below in 999,999 out of 1,000,000 future tests. Congress chose to require floors to reflect the "average" emission level achieved by the best-performing sources, and an agency interpretation that deprives that term of meaning must be rejected. *Leocal*, 543 U.S. at 12 ("we must give effect to every word of a statute wherever possible"); *UARG v. EPA*, 744 F.3d 741, 746-47 (D.C. Cir. 2014) (rejecting interpretation that would render statutory requirement "pointless"). *See also Halverson*, 129 F.3d at 189.

### b) The Upper Prediction Limit Does Not Reflect What Any Units Actually "Achieved."

By setting floors at the upper prediction limit, EPA also contravenes §7412(d)(3)'s unambiguous requirement that floors reflect what the best boilers "actually *achieved.*" *Sierra Club*, 479 F.3d at 880-81. As the agency stated in its

36

response to comments, "[t]he UPL is not a measure of the performance of the source but a prediction value," and because "[t]he UPL has incorporated the uncertainty of the future source, . . . **it does not represent the current sources**." 2011 RTC vol.1 at 769, JA____ (emphasis added). *See also id.* 929, JA____ (upper prediction limit "should not be used to rank the sources" or to "identify the best performing units"). The upper prediction limit does not merely address the variability in the emission levels that boilers actually "achieved"; rather, it further inflates the floors to ensure that they will be higher than the level EPA is 99 percent confident no source in the top 12 percent will exceed in a "future" compliance test. Jan.2011 Floor Memo 7, JA____ .

By requiring floors to reflect what the relevant best sources actually "achieved," however, the text of §7412(d)(3) eliminates any discretion to set floors at levels the agency expects the relevant boilers not to exceed in "future" compliance tests. Accordingly, EPA's contention that it has such discretion must be rejected. *See New Jersey*, 517 F.3d at 582 (rejecting interpretation that "substitut[es] EPA's desires for the plain text" of the statute); *Massachusetts v. DOT*, 93 F.3d 890, 893 (D.C. Cir. 1996), (an interpretation is unreasonable under *Chevron* step two where it "diverges from any realistic meaning of the statute").

EPA seeks to rely on *Mossville Environmental Action Now v. EPA*, 370 F.3d 1232, 1241-42 (D.C. Cir. 2004) ("*MEAN*"). 2011 RTC vol.1 at 919-20, JA____-__.

The agency's reliance on that case is misplaced. The *MEAN* Court did not absolve EPA from its statutory obligation to set floors that reflect the "average" emission level "achieved" by the best sources, as EPA appears to believe. Rather, it merely found that EPA may account for the variability in individual sources' emissions, *MEAN*, 370 F.3d 1241-42, a point that is not in dispute here.

### 3.     EPA's Reliance On The Upper Prediction Limit Was Arbitrary And Capricious.

*NACWA* confirms that, to promulgate a non-arbitrary rule, "EPA 'must demonstrate with substantial evidence—not mere assertions'" that its floors satisfy the statute. 734 F.3d at 1131. Nowhere in the record has EPA demonstrated that its upper prediction limit is an accurate estimate of the "average" emission level that the relevant best sources have actually "achieved." By EPA's own description, the upper prediction limit is neither the average emission level achieved by the best-performing sources nor the emission level achieved by an average source. Rather, it is a level EPA expects "any" source in the top 12 percent – including the worst – to fall below in any future test. Jan.2011 Floor Memo 7, JA____; 76 FR 15,630/1, JA____. Only in "Superman Comics' Bizarro world" could such an extreme upper limit be viewed as an "average." *NRDC v. Daley*, 209 F.3d 747, 754 (D.C. Cir. 2000).

The results of EPA's approach confirm that the agency's upper predictions do not reflect the average emission levels actually achieved by the best-performing sources. For example, it generates estimates of the single best boiler's performance that are worse than EPA's estimates of the performance of the top 12 percent of boilers in the same subcategory, and produces different answers to the same question depending on how much data EPA feeds into it. *See NACWA*, 734 F.3d at 1144. EPA has tried to sweep this problem under the rug by taking a voluntary remand of some standards but, as this Court held in *NACWA*, there are "flaws in the formula." *Id.* 1145. EPA scarcely demonstrates that the formula is now valid just by jettisoning some of its more egregious results.

Even if EPA could base floors on what it thinks the best-performing sources will achieve in the future rather than what they actually achieved in the past – which it cannot for the reasons given above – EPA's formula assumes that boilers' future will vary randomly. That notion is refuted by the record, which shows that boilers' performance is not random but, rather, is constrained by the steps that different operators take to control their emissions, including fuels they choose to burn, controls they install, and the care with which they operate those controls. EPA-HQ-OAR-2002-0058-2841 ("2010 NACAA Comments") at 15, JA____; Earthjustice Comments 6, JA____; CATF Comments 23-24, JA____-__. Indeed, in response to comments pointing out that "emissions variability is not statistical but

39

instead is based on different operating conditions of individual units," "EPA agree[s] with the commenter that the variability of emissions is not solely statistical." 76 FR at 15,630/1, JA_____. *See State Farm*, 463 U.S. at 43 (explanation is arbitrary where it "runs counter to evidence before the agency").

EPA asserts it is nonetheless "reasonable" to use its upper prediction limit to account for variability. 76 FR at 15,630/2, JA_____. But EPA's ability to account for variability in individual sources' emissions does not give the agency *carte blanche* to set the floors at any level it likes. However EPA chooses to account for variability, the agency must demonstrate with substantial evidence that its floors reflect the "average" emission level actually "achieved" by the best-performing sources – as  the statute says they must. *See NACWA*, 734 F.3d at 1131. Merely claiming that it is "reasonable" to account for variability does not even speak to this obligation, let alone explain how an average can be predicted with statistics alone when "the variability of emissions is not solely statistical." 76 FR 15,630/1, JA_____.  *See Podewils v. NLRB*, 274 F.3d 536, 541 (D.C. Cir. 2001) (agency's disregard of evidence is "quite astonishing").

40

**D.    EPA's New Rationale For The Upper Prediction Limit Is Unlawful And Arbitrary.**

**1.    This Court Should Not Entertain Or Defer To EPA's New Rationale.**

Contrary to EPA's representations when it sought a remand of the record, the Page Memo does in fact provide a series of new interpretations and assertions that, rather than "explaining" the prior record, instead contradict and revise the agency's earlier position.

In *NACWA*, the Court understood EPA to advance the "novel interpretation that 'average' means the average of a future 3-run compliance test." 734 F.3d at 1143. To obtain a voluntary remand of the record in the present case, EPA argued that *NACWA* held that interpretation "might well be reasonable," and represented that it was merely going to provide further explanation, not advance a different interpretation. EPA Reply in Support of Remand 6-7, JA____. Now, EPA disavows the interpretation it advanced in *NACWA* and interprets the term "average" variously to mean both "the **average emissions** over time" of the best-performing sources, Page Memo 3, JA____, and "the level of emissions that we are 99 percent confident is achieved by the **average source**," *id.* 4, JA____ (emphasis added).

In attempt to support these claims, EPA argues for the first time that the upper prediction limit is an "average" (in some undefined sense) because "the first

41

element of the UPL equation is the average of the short-term emissions test data from the best performing units." *Id.* Further, although EPA originally conceded that the upper prediction limit "does not represent the current sources," but is rather an estimate of future performance, 2011 RTC vol.1 at 769, JA____, EPA now claims it "reasonably estimates the level currently achieved" by the best performers. Page Memo 5, JA____. In addition, EPA imports data from a separate rule-making and argues that those data show its upper prediction approach in this rulemaking was "reasonable." *Cf.* EPA Reply in Support of Remand at 4, JA____ (representing that EPA "will not be adding new data to the record").

For EPA to rely on a memorandum "entered on the docket too late for any meaningful public comment prior to promulgation" violates "both the structure and spirit" of Clean Air Act §7607(d). *Sierra Club v. Costle*, 657 F.2d 298, 398 (D.C. Cir. 1981). *See* 42 U.S.C. §7607(d)(3) – (d)(7)(A). "A purpose of notice-and-comment provisions under the APA (and presumably of the more elaborate procedural safeguards in [§7607(d)] of the Clean Air Act) is 'to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is likely to give real consideration to alternative ideas.'" *NACWA*, 734 F.3d at 1148 (*quoting New Jersey Dept. of Envt'l Protection v. EPA*, 626 F.2d 1038, 1049 (D.C. Cir. 1980)). *See generally Sierra Club*, 657 F.2d at 393-94 (explaining §7607(d) and its purpose). Accordingly, this

Court should not even "entertain" the new statutory interpretations, factual assertions, and data that EPA's Page Memo contain, *id.* 398, let alone defer to them. *See Hays v. Sebelius*, 589 F.3d 1279, 1282 (D.C. Cir. 2009) (rejecting argument that "would permit an end-run around the statute").

### 2.    EPA's New Rationale For The Upper Prediction Limit Is Without Merit.

In *NACWA*, this Court directed the agency to "to clarify how the upper prediction limit represents the 'average emission limitation achieved by the best performing 12 percent.'" 734 F.3d at 1143. Even if it could properly be considered, EPA's response to the remand leaves the agency's basis for contending the upper prediction limit is the average less clear, if possible, than before.

### a)    The *Post Hoc* Memo Offers No Comprehensible Interpretation of the Statutory Language.

The Page Memo does not grapple with the meaning of the phrase "average emissions limitation achieved by the best performing 12 percent of the existing sources," assess §7412's legislative history, or analyze the overall framework of §7412. *Cf.* 59 FR at 29,196-200 (assessing text, legislative history, and overall statutory framework to conclude that statute requires "a measure of central tendency such as the arithmetic mean or median" of the "emission limitations achieved by each of the best performing 12 percent of existing sources"). But

43

neither is it faithful to the interpretation of the statute EPA maintained before

*NACWA* – or, indeed, to any single interpretation of the text. EPA concedes the

upper prediction limit is an "upper limit" on the relevant sources' emissions. Page

Memo 3, JA_____. Yet, at one point, the Memo implies that the upper prediction

limit may satisfy the Act by describing the "average level" achieved by the best

performers over time. *Id.* 4, JA_____. And at others, EPA suggests it satisfies the

Act by describing the emission level constantly achieved by a single "average

source." *Id.* 4, 10, JA_____, _____.

      If EPA means, by this, to suggest that the statute requires something other

than "a measure of central tendency such as the arithmetic mean or median" of

"the emission limitations achieved by each of the best performing 12 percent of

existing sources," 59 FR at 29,196, JA_____, its Response Brief will provide the

first explanation of what that interpretation is, and how the agency reached it. And

even if the Memo's various contradictory statements could suffice to create a new

"interpretation" of the statute (which they could not), and even if that new

interpretation of the statute were entitled to *Chevron* deference (which it is not),

claiming that the same statutory provision means different things "diverges from

any realistic meaning of the statute." *Massachusetts*, 93 F.3d at 893. It is also

arbitrary. *Dep't of Treasury v. FLRA*, 739 F.3d 13, 21 (D.C. Cir. 2014) ("set[ting]

forth two inconsistent interpretations of the very same term" is arbitrary and capricious).

          b)      **The *Post Hoc* Memo Offers No Basis to Conclude that the Upper Prediction Limit Produces an "Average."**

    Apart from the fact that EPA's two new claims that the upper prediction limit is an average conflict with each other, neither one of them "clarif[ies] how" the upper prediction limit is an "average." *NACWA*, 734 F.3d at 1143.

    EPA's new claim that the upper prediction limit represents the "average emissions over time" lacks merit for the reasons given above. *See supra* 34-36, 38-40. Everything in the Memo, aside from EPA's *ipse dixit* assertion that the upper prediction limit "provides results that reasonably represent . . . the average emissions limitation achieved by the best performing emissions units," Page Memo 4, JA____, confirms this point. The Memo describes the upper prediction limit as the level that "99 out of 100 performance tests" will "be below." *Id.* Indeed, the Page Memo not only describes the upper prediction limit as "an upper limit," *id.* 3, JA____, but defends it as "a limit that can be met by **all the existing sources** in the floor **at all times**." *Id.* 5, JA____ (emphasis added).Such a once-in-100 emissions level is not a measure of "average" emissions any more than a hundred-year flood can be a measure of 'average' water levels. *See NRDC*, 209 F.3d at 754 (only in "Bizarro world").

45

Nor can EPA support its new (and conflicting) claim that the upper prediction limit creates an estimate of the emissions limitation "achieved by the average source," Page Memo 4, JA____. The upper prediction limit produces a number that EPA expects "any" source in the top 12 percent to meet in any future test. Jan.2011 Floor Memo 7, JA____. A floor that EPA expects even the worst performing source within the top 12 percent to meet in any future test is not, in any sense, representative of "average" source in that group. *See NRDC*, 209 F.3d at 754.

Indeed, EPA's own long-standing interpretation of the Act – adopted through notice-and-comment rulemaking – is that "Congress spoke with clarity in [§7412(d)(3)(A)] of the Clean Air Act," and that the section "lends little support for an interpetation under which standards might be set at the emission limitation achieved by the worst performing member of the best performing 12 percent of existing sources," while the Act's legislative history "points strongly in the opposite direction"  from any such "worst-of-the-best" construction. 59 FR at 29,199, JA____.  EPA has consequently rejected any understanding of the word "average that would encompass an emission limitation "achieved by all members of the best performing 12 percent." *Id.* 29,197. Yet by its terms, that is precisely the function of the upper prediction limit. It is meant to yield an emissions limitation that "any" boiler – even the worst – within the top 12 percent can meet

46

"at all times." Page Memo 5, JA____. Nowhere does EPA even acknowledge its previous position, far less explain its apparent reversal. *See FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009) (agencies may not "depart from a prior policy *sub silentio*"); *Mountain Commc'ns v. FCC*, 355 F.3d 644, 648-49 (D.C. Cir. 2004) (action arbitrary where agency "changed direction without explanation, indeed without even acknowledging the change").

Further, the authorities on which the agency seeks to rest its claim that the upper prediction is an average confirm that the upper prediction limit is not an average. *See* Page Memo 4 & n.5, JA____ (*citing* Luko & Neubauer, Statistical Intervals Part 2: The Prediction Interval, *Standardization News* (October/Nov.2011) (http://www.astm.org/standardization-news/data-points/statistical-intervals-part-2-so11.html); Gibbons & Coleman, *Statistical Methods for Detection and Quantification of Environmental Contamination* (2001)). Luko and Neubauer state that the prediction limit is "different" from an "interval for the mean with some degree of confidence." Luko & Neubauer 1. Likewise, Gibbons and Coleman expressly note the difference between a prediction limit and a "confidence interval for the mean." Gibbons & Coleman 31.[10]

---

[10] These sources further point out that prediction limits provide "wider" results – that is, higher upper limits – than an estimate of the mean, in part because they

EPA argues that its upper prediction represents an average over time because "the first element of the UPL equation is the average of the short-term emissions test data from the best performing units." Page Memo 4, JA____. That is like saying that, over time, the average of 1, 2, and 3 = 2 + 500 because the "first element" in the equation (2) is the average of 1, 2, and 3. The mere fact that the **first element** of the equation is an average does not demonstrate that the **final product** of the equation is the average over time. EPA has provided no basis on which it (or the Court) could reasonably conclude that just because its upper prediction equation starts with an average and then adds a number to "address variability," this equation yields the average over time. Rather, EPA merely asserts this point, demanding once again that the Court "rubber-stamp [its] invocation of statistics without [] explanation of the underlying principles or reasons why its formulas would produce an accurate result." *NACWA*, 734 F.3d at 1145.

EPA also argues that because the average is in the first half of equation, the upper prediction limit "goes up or down" with average emissions. Page Memo 11, JA____. As the agency admits in the next breath, however, the upper prediction also goes up or down with factors that are entirely unrelated to the average: "the

---

reflect "the variability of future observations," rather than just the variability in sources' actual performance. Gibbons & Coleman 31.

48

number of runs in the dataset" and "the number of runs averaged for each

emissions test." *Id. See NACWA*, 734 F.3d at 1144-45. Indeed, the record shows

that the number of runs in a dataset can make EPA's upper prediction go up (*i.e.*,

get worse) even when the average emissions achieved go down (*i.e.*, get better).

*See NACWA*, 734 F.3d at 1144.

Lastly, EPA imports an emissions test dataset from another rulemaking to

argue that because "not all" individual test runs in that dataset are below it, the

upper prediction limit for that dataset "represents the *average* emission level

achieved by the best performing sources." Page Memo 14, JA_____. As EPA

concedes, however, "no source among the best performing 12 percent had an

overall average above the 99 percent UPL," and only the worst performing source

in the top 12 percent had even one "3-run test average above the UPL." *Id.*[11] To

argue that just because one test result is higher than the upper prediction limit the

upper prediction limit is an "average" is – again – like arguing that because a river

will sometimes reach its 100-year flood level, the 100-year flood level is an

"average" height for the river.

---

[11] That four units had "one test run value" above EPA's upper prediction, *id.*, is
irrelevant. According to EPA, the upper prediction limit produces an estimate of a
3-run test average, not a single "test run." *Id.*

49

EPA's inability to support its argument even with handpicked data from another rulemaking is revealing. Those data – as well as the relevant emissions data from this rulemaking – speak volumes. *See supra* 13-15; Sahu Declaration ¶¶9, 17-18. If, as EPA asserts, the upper prediction limit predicts the emissions limitation consistently achieved by the "average source" among the best performers, Page Memo 4, JA____ or (as EPA also, and contradictorily, contends) the "average emissions limitation" achieved by the best performing units – why do **all** the best performers fall below it, virtually **all** of the time?

> c)  **The *Post Hoc* Memo Offers No Basis to Conclude that EPA's Upper Prediction Reflects Emission Levels "Actually Achieved."**

The Page Memo directly contradicts EPA's original conclusion that the upper prediction is an estimate of the emission level that boilers will fall below in a "future" compliance test, Jan.2011 Floor Memo 7, JA____, and therefore "does not represent the current sources." 2011 RTC vol.1 at 769, 929, JA____, ____ ("should not be used to rank the sources and identify the best performing sources"). In it, EPA now claims the upper prediction limit is also a "predict[ion]" of "past" and "present" performance, Page Memo 10, JA____, and "reasonably estimates the level currently achieved . . . by the best performing 12 percent of sources," *id.* 5, JA____.

50

EPA does not provide any explanation for this reversal. Far from claiming that the formula has changed, EPA confirms its upper prediction is still "inversely related to the number of runs in the dataset and to the number of runs averaged for each emissions test." *Id.* 11, JA_____. Nor does EPA explain why it now thinks that the same formula that previously predicted only a number that "future" tests would fall below now also predicts past and current performance. *See Fox Television Stations*, 556 U.S. at 515. Further, EPA's new position is refuted by the agency's own authorities, which confirm that the upper prediction limit does not estimate past variability but rather – as EPA itself conceded in the rulemaking – estimates "the variability of the future observation." Gibbons & Coleman 31.

Nor does the Page Memo cure any of the arbitrariness in EPA's reliance on the upper prediction limit during the rulemaking. As shown above, it fails to demonstrate that the upper prediction limit reflects the "average emission limitation" actually achieved by the relevant best-performing sources. Further, it does not explain how merely discarding some of the absurd results produced by the upper prediction limit formula resolves the "flaws in the formula." *See supra* 39. Finally, the Page Memo does not even address EPA's assumption that all variation in boilers' performance is inherent variability over which operators have no control. Thus, it leaves that assumption as it was in the rulemaking – wholly unsupported and admittedly inaccurate.

51

## CONCLUSION

Environmental Petitioners respectfully request that the challenged rules be remanded with instruction that EPA issue revised rules free of the defects identified above.


DATED:     August 12, 2014          Respectfully submitted,

                                    /s/James S. Pew
                                    James S. Pew
                                    Earthjustice
                                    1625 Massachusetts Ave., N.W.
                                    Suite 702
                                    Washington, D.C. 20036-2212
                                    (202) 667-4500
                                    jpew@earthjustice.org

                                    *Counsel for Environmental Petitioners*

## CERTIFICATE REGARDING WORD LIMITATION

Counsel hereby certifies that, in accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), the foregoing Proof Opening Brief for Environmental Petitioners contains 11,172 words, as counted by counsel's word processing system, and thus complies with the applicable word limit established by the Court.


DATED: August 12, 2014

/s/James S. Pew
James S. Pew

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of August, 2014, I have served the

foregoing **Proof Opening Brief for Environmental Petitioners** on all registered

counsel through the Court's electronic filing system (ECF).

/s/ James S. Pew
James S. Pew